## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE 209 Saint Ferdinand Street Baton Rouge, LA 70802, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) | No. 8:19-cv-02713-GJH |
| Lead Plaintiff, | ) ) | |
| vs. | ) ) | |
| MACROGENICS, INC. 9704 Medical Center Drive Rockville, MD 20850 County of Montgomery, | ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| – and – | ) ) | |
| SCOTT KOENIG c/o MACROGENICS, INC. 9704 Medical Center Drive Rockville, MD 20850 County of Montgomery, | ) ) ) ) ) ) | |
| – and – | ) ) | |
| JAMES KARRELS c/o MACROGENICS, INC. 9704 Medical Center Drive Rockville, MD 20850 County of Montgomery, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT FOR VIOLATIONS OF
## THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................. 1

    I.       THE CLAIMS ASSERTED IN THIS COMPLAINT ............................................. 6

PART ONE: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934 .................... 7

    I.       JURISDICTION AND VENUE .......................................................................... 7

    II.      THE EXCHANGE ACT PARTIES....................................................................... 7

    III.    SUBSTANTIVE ALLEGATIONS ..................................................................... 9

          A.      The SOPHIA Study.............................................................................. 9

          B.      The Undisclosed Adverse Facts......................................................... 13

          C.      The Start of the Class Period: Defendants' Initial Disclosures of SOPHIA Data...................................................................................... 13

          D.      The Company's February 2019 Offering................................................. 16

          E.      Defendants Continue to Tout the Results of the SOPHIA Study ............. 18

    IV.    THE UNDISCLOSED ADVERSE FACTS BEGIN TO PUBLICLY EMERGE .................................................................................................... 21

    V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD .............................................. 29

    VI.    FRAUDULENT SCHEME AND ADDITIONAL SCIENTER ALLEGATIONS........................................................................................... 36

    VII.   ADDITIONAL LOSS CAUSATION ALLEGATIONS ...................................... 38

    VIII.  CLASS ACTION ALLEGATIONS ................................................................. 39

PART TWO: CLAIMS UNDER THE SECURITIES ACT OF 1933.......................................... 42

    I.       SECURITIES ACT CLAIMS............................................................................. 42

    II.      JURISDICTION AND VENUE ........................................................................ 43

    III.    THE SECURITIES ACT PARTIES ................................................................... 44

          A.      The Securities Act Plaintiff.................................................................. 44

          B.      The Securities Act Defendants.............................................................. 44

IV.     THE DEFECTIVE FEBRUARY 2019 OFFERING ............................................. 46

        A.      The Materially False and Misleading Offering Documents .................... 46

        B.      Material Omissions in the Company's Offering Documents in
                Violation of Applicable Regulations ......................................... 51

V.      CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................... 52

PRAYER FOR RELIEF ............................................................................... 58

JURY DEMAND ...................................................................................... 59

Lead Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("CPERS" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants MacroGenics, Inc. ("MacroGenics" or the "Company"), Scott Koenig, and James Karrels (collectively, "Defendants"), alleges the following based upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by the Company, the Company's press releases and earning conference call transcripts, and analyst and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action brought on behalf of all those who purchased or otherwise acquired shares of the common stock of MacroGenics between February 6, 2019 and June 4, 2019, inclusive (the "Class Period"), including all those who purchased such shares directly in the Company's February 13, 2019 secondary public offering (the "February 2019 Offering" or simply the "Offering"), seeking remedies under the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act") for materially false, misleading and/or incomplete statements made (and related material omissions committed) during the Class Period. These claims – including claims based on Defendants' use of materially defective Offering Documents (defined below) to effectuate the Offering – are asserted against MacroGenics and its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO").

2.     MacroGenics is a clinical-stage biopharmaceutical company.  At all relevant times, MacroGenics was developing Margetuximab, an antibody that was developed to provide a

1

treatment for patients with certain metastatic breast cancers, and specifically for those patients who have undergone other treatments with sub-optimal results.  Margetuximab is and was, at all relevant times, a critically important product to the Company and to the market's assessment of the Company's value.  As of the filing of the Offering Documents for the February 2019 Offering, of the Company's seven product candidates, Margetuximab was the first to be tested in a Phase 3 clinical trial.

3.      "SOPHIA" is the name of MacroGenics' Phase 3 clinical trial of Margetuximab. The SOPHIA trial compared the performance of Margetuximab (in combination with chemotherapy) to that of another therapeutic antigen, Trastuzumab (in combination with chemotherapy), that had already received U.S. Food and Drug Administration ("FDA") approval and that was already established as the market-leading, standard biologic treatment for breast cancer.  SOPHIA has two primary endpoints: (a) establishing a meaningful benefit of Margetuximab compared to Trastuzumab in terms of "progression free survival" ("PFS") (which measures how long patients enrolled in a given treatment arm of a clinical trial continue to survive, post-enrollment, without progression of the disease); and (b) establishing a meaningful benefit of Margetuximab compared to Trastuzumab in terms of "overall survival" ("OS") (which measures how long such patients survive for ***any*** reason and ***without*** regard to whether they experienced any post-enrollment progression of their disease).

4.      During the months that preceded the start of the Class Period (February 6, 2019), MacroGenics conducted an initial analysis of the SOPHIA data, which used October 10, 2018, as the cut-off date for the data considered.  With these results in hand (and immediately prior to conducting the Company's lucrative February 2019 Offering), Defendants began to selectively – and misleadingly – release those aspects of the SOPHIA analysis that were ***positive*** for the

Company and Margetuximab, while withholding those aspects of the SOPHIA analysis that were *negative*.

5.      In particular, on February 6, 2019, the Company announced what it described as "positive" results from what it described as its "pivotal" SOPHIA study.  Specifically, the Company announced that its review of the October cut-off data[1] showed a statistically significant PFS benefit in the Margetuximab cohort, which was one of SOPHIA's two primary endpoints. The Company, however, offered no information regarding what the October cut-off data indicated, with respect to OS, except to say that the OS data was still "maturing."   On this news, MacroGenics' stock price skyrocketed, ***increasing 130%*** that same day to close at $25.60 – representing a staggering $14.49 per share gain compared to its closing price of $11.11 on the previous trading day).

6.      Just six days later, on February 12, 2019, MacroGenics capitalized on this sudden boom in its stock price by announcing that it would be holding, on the very next day, a large secondary public offering of its common shares, pursuant to its "shelf registration" statement previously filed with the SEC, at an offering price of $20.00 per share.  The resulting February 2019 Offering was held on February 13, 2019, and raised $126.5 million in gross proceeds for the Company.

7.      Over the next few months, MacroGenics continued to make statements that touted SOPHIA's positive PFS data, while declining to comment on SOPHIA's OS data other than to describe it as "not mature."

---

[1]      This Complaint uses the term "October cut-off data" to refer to the dataset that was effectively locked for analytical purposes as of an October 10, 2018 "cut-off" date.  In other words, such data would reflect, *e.g.*, patient deaths experienced through the October 10 cut-off date, but would not reflect deaths experienced thereafter, even if patients continued to be monitored after that date.

8.      However, throughout the Class Period, the Company had additional – and adverse – information concerning OS data from the SOPHIA trial that it chose not to disclose to investors. In particular, during roughly the same period (in the months immediately prior to the Class Period) that the above-referenced PFS analysis had been put together using the October cut-off data, an initial "interim" OS analysis had also been put together using the same data. However, MacroGenics did not begin to even partially disclose any of the resulting interim OS results until May 15, 2019, when it disclosed that this data showed that the median OS "was prolonged by 1.7 months in patients treated with margetuximab and chemotherapy compared to patients treated with trastuzumab and chemotherapy" (and was prolonged by 6.8 months for the subset of patients that carried the CD16A 158F allele[2]).  However, to the extent that a more complete report of SOPHIA's interim OS results might also be favorable, that notion would soon be quashed.

9.      On June 4, 2019, significantly fuller information from the pre-Class Period interim OS analysis – which had been available to the Company for months – was finally disclosed to the public at the annual meeting of the American Society of Clinical Oncologists ("ASCO") (the "ASCO Conference").  The information relating to SOPHIA's interim OS analysis of the October cut-off data, which the Company presented at the ASCO Conference (but which it had not previously disclosed), was materially adverse.

10.      In particular, the Company's presentation included "Kaplan-Meier curves" of the OS data, which tracked OS performance over time.  Kaplan-Meier curves are linear graphs that are used as part of even the most basic comparative analyses of different treatment arms in a clinical study of a new drug or biologic treatment, and are used as a matter of customary industry and scientific practice to identify changes and trends in data over time, and to help assess whether

---

[2]      An "allele" is one of two or more alternative forms of a gene that arise by mutation, control the same trait, and are found at the same place on a chromosome.

observed differences are genuinely significant or are the result of only short-term effects.  The Kaplan-Meier curves of the OS October 2018 cut-off data for the Margetuximab and Trastuzumab patient cohorts that were finally disclosed at the ASCO Conference were *not* favorable for Margetuximab, primarily because the lines (a) "crossed" in several places; and (b) "separated late," indicating that patients in the Trastuzumab cohort performed better than those in the Margetuximab cohort, as one looked at the data over an increasing long temporal interval.  Accordingly, this basic Kaplan-Meier presentation of the OS data – as shown in the graph presented at the ASCO Conference and reproduced at ¶67 below – indicated that the available OS data from the SOPHIA study was *not* on track to show that the Company's Margetuximab product would increase (let alone meaningfully increase) overall patient survival rates compared to treatment with the already-existing and widely available Trastuzumab.  *See also* ¶¶68-74 *infra*.

11.     On this news, the price of MacroGenics stock *fell over $4.00 per share – equal to a decline of more than 21%* – over two days, falling from $18.71 on June 3, 2019 to close at only $14.66 on June 5.  This decline also reflected an overall collapse *of 43%* from the stock's Class Period high of $25.60 on February 6, 2019, and *of 27%* from its $20.00 per share February 2019 Offering price.

12.     As a result of Defendants' wrongful acts and omissions as alleged herein, Plaintiff and the members of the Class (defined below) purchased MacroGenics common stock at artificially inflated prices and suffered significant losses as the full truth about SOPHIA's October cut-off data began to be revealed.

13.     Plaintiff, on behalf of itself and the Class it seeks to represent, now brings this suit to recover the losses it has suffered as a result of Defendants' materially false, misleading, and incomplete statements.

## I.     THE CLAIMS ASSERTED IN THIS COMPLAINT

14.     As further set forth below, Plaintiff asserts two separate sets of claims.  Counts I and II, as set forth in Part One of this Complaint, assert securities fraud claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  These claims are asserted against the Defendants, consisting of (a) MacroGenics; (b) Defendant Scott Koenig ("Koening"), MacroGenics' President and CEO; and (c) James Karrels ("Karrels"), MacroGenics' CFO and Treasurer.  These claims specifically incorporate all allegations and inferences from the facts alleged that these Defendants made the materially false, misleading, and incomplete statements and omissions alleged herein with *scienter* (*i.e.*, intentionally or recklessly), in violation of §10(b) and Rule 10b-5 promulgated thereunder, and that Defendants Koening and Karrels are also liable under Count Two as control persons under §20(a).

15.     Counts III, IV, and V, set forth in Part Two of this Complaint, assert strict liability and negligence claims under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") in connection with the February 2019 Offering.  The non-fraud claims under §§11 and 12(a)(2) are asserted against MacroGenics (as issuer), and its CEO and CFO (Defendants Koenig and Karrel, respectively), who both signed the defective Offering Documents for that Offering.  In addition, Defendants Koening and Karrels are named as "control person" defendants under §15 of the Securities Act.

16.     Plaintiff specifically disclaims any allegations of fraud or fraudulent intent in the separately pleaded non-fraud Securities Act claims asserted in Counts III, IV, and V, with the proviso that any challenged statements of opinion or belief made in connection with the Offering Documents are alleged to have been actionable and materially inaccurate, misleading, or incomplete statements of opinion or belief as of the date of the Offering.

**PART ONE:**
**CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934**

**I.      JURISDICTION AND VENUE**

17.      The claims asserted in this Part One arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

18.      This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

19.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and MacroGenics is headquartered in this District.

20.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and facilities of the national securities exchange.

**II.      THE EXCHANGE ACT PARTIES**

21.      Lead Plaintiff CPERS is an approximately $1.2 billion defined benefit fund operated for the benefit of employees in the City of Baton Rouge, as well as firefighters and police officers.  CPERS purchased MacroGenics common stock during the Class Period and directly in the February 2019 Offering, as set forth in the certification filed with its lead plaintiff papers (ECF No. 21-2), and was damaged thereby.

22.      Defendant MacroGenics is a Delaware corporation with its principal executive offices located at 9704 Medical Center Drive, Rockville, Maryland 20850.  MacroGenics common

stock trades on the NASDAQ under the ticker symbol "MGNX."  MacroGenics held its initial

public offering in 2013.

23.    Defendant Koenig is, and at all relevant times has been, President, CEO, and a

director of MacroGenics.  Koenig signed the Registration Statement for the February 2019

Offering, signed the Company's 2018 10-K, and made various other relevant statements during

the Class Period.

24.    Defendant Karrels is, and at all relevant times has been, CFO and Senior Vice

President of MacroGenics.  Karrels signed the Registration Statement for the February 2019

Offering, signed the Company's 2018 Form 10-K, and made various other relevant statements

during the Class Period.

25.    Defendants Koening and Karrels are sometimes collectively referred to herein as

the "Officer Defendants" and together, with Macrogenics, all three are sometimes referred to

herein as the "Defendants."

26.    The Officer Defendants, because of their positions with the Company, possessed

the power and authority to control the contents of MacroGenics' quarterly reports, press releases,

and presentations to securities analysts, money and portfolio managers, and institutional investors,

*i.e.*, the market.  They were provided with copies of the Company's reports and press releases

alleged herein to be misleading prior to or shortly after their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Because of their positions

with the Company, and their access to material non-public information available to them but not

to the public, the Officer Defendants knew that the adverse facts specified herein had not been

disclosed to and were being concealed from the public and that the positive representations being

made were then materially false and misleading.  The Officer Defendants are liable for the false and misleading statements pleaded herein.

27.     Defendants made, or caused to be made, materially false, misleading, and incomplete statements that caused the price of MacroGenics common stock to be artificially inflated during the Class Period.

## III.     SUBSTANTIVE ALLEGATIONS

28.     MacroGenics is a clinical-stage biopharmaceutical company focused on the development of antibody-based therapeutics designed to control the human immune response for the treatment of cancer.

29.     Its pipeline of immuno-oncology product candidates includes Margetuximab, an investigational monoclonal antibody that targets the HER2 oncoprotein, a tumor-associated antigen.  HER2 is a protein found on the surface of some cancer cells that promotes growth and is associated with aggressive disease and poor prognosis.

30.     Margetuximab is and was, at all relevant times, an integral product to the Company and its most advanced clinical product candidate.  Of the Company's seven product candidates, as of the start of the Class Period, Margetuximab was the first to be tested in a Phase 3 clinical trial.

### A.     The SOPHIA Study

31.     "SOPHIA" is the name of the Company's Phase 3 clinical trial of Margetuximab. SOPHIA was designed to compare the results of (a) Margetuximab (plus chemotherapy) treatment versus (b) Trastuzumab (plus chemotherapy) treatment in patients with HER2-positive metastatic breast cancer who had previously been treated with anti-HER2-targeted therapies.  SOPHIA enrolled 536 patients at approximately 200 trial sites across North America, Europe, and Asia,

with the patients in the study being divided into either a Margetuximab (plus chemotherapy) cohort or Trastuzumab (plus chemotherapy) cohort.[3]

32.     The lead study author for the SOPHIA trial Dr. Hope Rugo ("Dr. Rugo"), the Director of the Breast Cancer Oncology and Clinical Trials Education at University of California San Francisco and Clinical Professor of Medicine at University of California San Francisco's Helen Diller Comprehensive Cancer Center Consortium.   However, at least three senior MacroGenics executives/scientists were also members of the roughly 19-person study team that managed and supervised SOPHIA, namely:

(a)     Edwin P. Rock, M.D., Ph.D., MacroGenics' Vice President for Clinical Research;

(b)     Shengyan (Sam) Hong, Ph.D., MacroGenics' Executive Director for Biostatistics; and

(c)     Sutton Edlich, MacroGenics' Associate Director for Clinical Research.

33.     A clinical study's "primary endpoints" are the pre-established key measures of success of a clinical study and are the only measures by which the study can draw conclusions. SOPHIA has two primary endpoint metrics: (a) prolongation of PFS, determined by centrally blinded radiological review; and (b) prolongation of OS.  The study data (as of pre-specified dates) is sequentially assessed over time and results from SOPHIA continue to be reported to this day.

---

[3]     SOPHIA's 536 patients are sometimes referred to by the Company as the "intent-to-treat" population.  Intent-to-treat (or "ITT") is a term of art that refers to a clinical research method where the researcher must report all observed data, including certain baseline data, for all originally enrolled trial participants, even if they later dropout.  That is, once a particular patient is randomly placed into a trial cohort, even if that patient thereafter stops getting the treatment for his originally assigned cohort, or is switched into another cohort or drops out of the study altogether, that patient's medical performance for purposes of "ITT reporting" of trial results are still analyzed as if that patient had followed the trial protocol for the initially assigned treatment group for the entire trial period.

With respect to both primary endpoints, MacroGenics' objective was to be able to show that the Margetuximab-based treatment delivered meaningfully superior PFS and OS results compared to the Trastuzumab-based treatment.[4]

34.      The first endpoint of the SOPHIA study – PFS – measures the length of time (measured in months) during and after the treatment of a disease (here, breast cancer) that a patient survives with the disease without the disease getting worse.  The second endpoint of the study – OS – is the length of time from either the date of diagnosis or the start of treatment for a disease (here, breast cancer) that patients diagnosed with the disease are still alive.

35.      OS is invariably a critically important endpoint when evaluating a potential new treatment (such as Margetuximab) for a disease associated with high mortality (such as breast cancer).  First, although showing superior OS results compared to existing standard therapies may not necessarily by required to obtain approval from the FDA, showing such superior OS results substantially increases the likelihood of FDA approval.  Second, and of no less importance to investors, showing superior OS results is critical to the commercial prospects of a drug like Margetuximab.  With multiple breast cancer treatment options available (including other breast cancer biologics or drugs on the market), oncologists are much more likely to prescribe treatments that have not only been proven to extend the lives of patients, but have also been shown to produce results that are meaningfully superior to those obtained from the use of existing "standard of care" treatments (*e.g.*, Trastuzumab here).

36.      On November 7, 2018, MacroGenics held a conference call with investors, analysts, and the media to discuss its third quarter 2018 financial results, during which Defendant Koenig

---

[4]      SOPHIA also had a pre-specified "exploratory objective" of evaluating the effect of an allelic variation (known as the CD16A 158F variation) on Margetuximab activity.  Approximately 85% of the overall human population, as well as approximately 85% of patients enrolled in the SOPHIA study, carry the CD16A 158F allele (the "subgroup").

acknowledged that the Company was closely following the PFS and OS data from SOPHIA. Koenig stated, in part:

> In the third quarter we completed enrollment in our pivotal Phase III SOPHIA study, which is evaluating the efficacy of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy and approximately 530 relapsed/refractory HER-2-positive metastatic breast cancer patients. . . .
>
> I do not know the results of the data, neither do other members of the team. . . .
>
> If the data turns out to be a positive, we don't want to delay at all being able to provide a very effective treatment to patients. So shouldn't read anything more than that, that we're very diligent group and trying to do our work. . . .
>
> So clearly, we have been tracking the PFS rate as well as OS rate in the population, it's tracking with our expectations. And that's why we're able to indicate that we should have the top line PFS data in the first quarter to announce.

37.     On January 10, 2019, MacroGenics held a conference call with investors, analysts, and the media, during which Defendant Koenig again made clear that the Company was closely monitoring the SOPHIA trial.  He stated, in part: "We're pursuing the registration study in Phase III in a study called SOPHIA in metastatic breast cancer[.] . . . We will have top line PFS data readout in the first quarter of this year[.] . . . The data is getting cleaned currently, and we expect to unmask the data in the first quarter of this year and report it out in a press release."

38.     The reference to "cleaning the data" in the context of being able to report PFS data was understandable because, *inter alia*, the data (such as radiological scans) used to determine whether a given surviving patient's cancer did – or did not – "progress" will often need to go through multiple adjudication steps, particularly if different reviewing radiologists are initially unable to reach agreement on, *e.g.*, tumor growth.  However, this type of time-consuming "data cleaning" does not arise in assessing ***overall*** survival (OS), as OS involves measuring only the length of patient survival (without regard to the complexities of assessing whether the patient's survival was, or was not, accompanied by disease progression).  Accordingly, it is virtually certain

12

that by the time that analysis of the SOPHIA data (as of a given cut-off date) was unmasked ***for PFS purposes*** "in the first quarter of this year," the same data would have also been available and subjected to basic statistical analysis by the same time (if not well before) ***for OS purposes***.

B.    **The Undisclosed Adverse Facts**

39.    Throughout the Class Period, Defendants issued a series of positive statements that touted the positive aspects of the then-available SOPHIA data.  As summarized above and further detailed below, however, these positive statements were all materially false, misleading, or incomplete because, *inter alia*, they failed to disclose that the available SOPHIA data was materially less promising – and the prospects for Margetuximab to ultimately satisfy both of its primary endpoints in the critically important SOPHIA trial were materially more uncertain – than Defendants' selectively positive statements and artful omissions indicated.  The details of basic Kaplan-Meier analysis – and why Defendants' failure to disclose the results of that analysis before the end of the Class Period rendered their Class Period statements false and misleading – are set forth in ¶¶64-79 below, in the section entitled "The Undisclosed Adverse Facts Begin to Publicly Emerge."  First, however, the sections immediately below will recount events as they were observed at the time by investors as the Class Period progressed.

C.    **The Start of the Class Period: Defendants' Initial Disclosures of SOPHIA Data**

40.    On February 6, 2019, before the market opened, MacroGenics made its first announcement concerning SOPHIA's results in a press release.  In that press release, entitled "MacroGenics Announces Positive Results from Pivotal Phase 3 SOPHIA Study of Margetuximab" (the "February 6 Press Release"), the Company touted the SOPHIA results as follows:

> The SOPHIA clinical trial ***met the primary endpoint of prolongation of progression-free survival (PFS)*** in patients treated with the combination of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy.

13

Patients in the margetuximab arm experienced a ***24% risk reduction in PFS*** compared to patients in the trastuzumab arm (HR=0.76, p=0.033). Notably, approximately 85% of patients in the study were carriers of the CD16A (FcγRIIIa) 158F allele, which has been previously associated with diminished clinical response to HERCEPTIN [the trade name for Trastuzumab] and other antibodies. ***In this pre-specified subpopulation, patients in the margetuximab arm experienced a 32% risk reduction in PFS*** compared to patients in the trastuzumab arm (HR=0.68, p=0.005). Results of the SOPHIA study are being prepared for submission for publication and presentation later this year at a major scientific conference. ***Follow-up for determination of the impact of therapy on the sequential primary endpoint of overall survival (OS) is ongoing, as pre-specified in the study protocol and recommended by the trial's independent Data Safety Monitoring Committee***. MacroGenics anticipates submitting a Biologics License Application (BLA) to the U.S. Food and Drug Administration in the second half of 2019. . . .

"We are pleased with the SOPHIA clinical results and are especially grateful to the patients, their caregivers, trial investigators and site personnel who participated in the study. I would also like to thank the entire MacroGenics team and our business partners who worked diligently to bring margetuximab to the clinic and execute the SOPHIA study," said Scott Koenig, M.D., Ph.D., MacroGenics' President and CEO. "Our Fc-engineered, immune-enhanced molecule has demonstrated a ***superior outcome in a head-to-head study*** against HERCEPTIN [Trastuzumab]. ***We look forward to additional opportunities to develop margetuximab*** in other HER2-positive breast and gastric cancer populations."

[Emphasis added.]

41.     The Company also held a conference call to discuss these results later in the day on February 6, 2019 (the "February 6 call"), in which both Defendants Koenig and Karrels participated with both presenting statements and answering questions.  On that call, Defendant Koenig stated, in pertinent part:

The results of the SOPHIA study are being prepared for submission – for publication and presentation later this year at a major scientific conference. Follow-up for determination of the impact of therapy on the sequential primary endpoint of overall survival is ongoing as prespecified in the SOPHIA study protocol and recommended by the Data Safety Monitoring Committee.

Let me remind listeners that ***there are currently no approved therapies for the treatment of metastatic breast cancer patients who were previously treated with HERCEPTIN*** [Trastuzumab], Perjeta and Kadcyla. ***In this study, MacroGenics demonstrated a superior outcome in a head-to-head study against HERCEPTIN***,

and we're anticipating submitting a BLA to the U.S. FDA in the second half of 2019.

[G]iven that this is a highly overtreated population and we're still seeing positive results, the ability to now move this up the line of therapy for breast cancer as well as for other HER2-positive tumors, I think provides us with greater upside opportunity for a commercial market for Margetuximab.

[Emphasis added.]

42.     In addition, the following colloquy occurred on the February 6 call, between analyst

Debjit D. Chattopadhyay (of H.C. Wainwright & Co, LLC) and Defendant Koenig:

[Analyst:]     Congratulations again, and ***this was especially sweet since this was written off by so many***. So the bulk of the questions, especially on PFS and everything has been answered. So ***maybe if we can spend a little bit more time on the overall survival. So any trends you can share with us or how many events have already happened?*** And playing the devil's advocate, what happens to the filing if OS somehow disappoints?

[Koenig:]     So thank you very much. Let's start with the second question, which is, the filing is not dependent on OS. Obviously, we will submit this. This was based on the discussions we had with the FDA.

Having said that***, the trending for OS has been positive in the direction of margetuximab,*** but we just don't have enough events to be able -- to have significance here. So we'll continue to follow that, but everything, so far, is consistent with the biological activity of the molecul*e*.

[Emphasis added.]

43.     In response to the Company's positive February 6 Press Release and conference call commentary, as well as subsequent published analyst commentary, the price of MacroGenics common stock ***soared an astonishing $15.49 per share in one day***, leaping from its previous closing price of $11.11 to close at $25.60 on February 6, 2019 – ***an increase of more than 130%.***

44.     Indeed, as *MedCity News* reported on February 6, 2019:

Shares of MacroGenics went stratospheric Wednesday following the release of data from a pivotal Phase III study of the company's lead drug candidate in breast cancer that beat many investors' expectations. . . .

In a conference call to discuss the results Wednesday morning, some analysts conceded that their forecasts of SOPHIA being a negative study did not come true, including one who said his firm was "dead wrong."

Nevertheless, the company is being tight-lipped at the moment about a key data point, the exact improvement in PFS for SOPHIA's margetuximab arm over the Herceptin [Trastuzumab] arm. It is also not providing details [regarding] the trial's median overall survival.

### D. The Company's February 2019 Offering

45.     Six days later, on February 12, 2019, MacroGenics announced that it would take advantage of the massive increase that the Company's stock price had experienced in the wake of its February 6 Press Release by announcing that it would conduct a further public offering of MacroGenics' common stock pursuant to its pre-existing shelf registration statement.

46.     On February 13, 2019, MacroGenics proceeded to issue and sell 6.325 million shares of common stock (including 825,000 shares issued pursuant to the underwriter's overallotment option) at an Offering price of $20.00 per share.  As a result, investors paid ***over $126 million*** to acquire these newly issued shares pursuant to the February 2019 Offering – and the Company reaped net offering proceeds of ***roughly $118.7 million*** (net of underwriter discounts and commissions and other offering expenses).

47.     In connection with this Offering, on February 13, 2019, MacroGenics filed a Prospectus Supplement, dated as of February 12, 2019 (the "Prospectus") (which, in turn, supplemented a previously filed Form S-3 Registration Statement and initial prospectus that had been filed with the SEC on November 2, 2016).  The Prospectus also incorporated by reference the Company's February 6 Press Release.  The foregoing materials are collectively referred to herein as the "Offering Documents."

48.     The Offering Documents (in addition to incorporating the text of the February 6 Press Release) again touted SOPHIA's PFS results, stating:

HER 2-positive Metastatic Breast Cancer. In February 2019, we announced positive results from SOPHIA, our Phase 3 clinical trial of margetuximab in HER2-positive metastatic breast cancer patients.   Margetuximab is an investigational immune-enhancing monoclonal antibody derived from our proprietary Fc Optimization technology platform. ***The SOPHIA clinical trial met the trial's first primary endpoint of prolongation of progression-free survival (PFS) in patients treated with the combination of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy. Patients in the margetuximab arm experienced a 24% risk reduction in PFS compared to patients in the trastuzumab arm*** (HR=0.76, p=0.033).   Notably, approximately 85% of patients in the study were carriers of the CD16A (FcγRIIIa) 158F allele, which has been previously associated with diminished clinical response to trastuzumab and other antibodies. ***In this pre-specified subpopulation, <u>patients in the margetuximab arm experienced a 32% risk reduction in PFS compared to patients in the trastuzumab arm</u>*** (HR=0.68, p=0.005).

[Emphasis added.]

49.     As the Prospectus also went on to state:

Results of the SOPHIA study are being prepared for submission for publication and presentation later this year at a major scientific conference. ***Follow-up for determination of the impact of therapy on the sequential second primary endpoint of overall survival (OS) is ongoing, as pre-specified in the study protocol and recommended by the trial's independent Data Safety Monitoring Committee.*** We anticipate submitting a Biologics License Application (BLA) to the U.S. Food and Drug Administration for margetuximab on the basis of the PFS results in the second half of 2019.

The SOPHIA study enrolled 536 patients at approximately 200 trial sites across North America, Europe and Asia. The study evaluated margetuximab in a Phase 3 clinical trial in patients with advanced HER-2+ breast cancer who had received at least two prior lines of antiHER-2 directed therapy in the metastatic setting, or in the case of having received (neo)adjuvant pertuzumab, at least one prior line of antiHER-2 directed therapy in the metastatic setting, and who have received at least one and no more than three prior lines of therapy overall in the metastatic setting. Patients were treated with either margetuximab or trastuzumab in combination with [chemotherapy.] . . . All study patients had previously received trastuzumab and pertuzumab, and approximately 90% had previously received ado-trastuzumab emtansine. The combination of margetuximab and chemotherapy demonstrated acceptable safety and tolerability, comparable overall to that of trastuzumab and chemotherapy.

[Emphasis added.]

17

50.     The Offering Documents' reference to the results of the SOPHIA study as being prepared for presentation "later this year at a major scientific conference" was a reference to the upcoming June 2019 ASCO Conference.  The deadline for submitting abstracts for presentations to be made at the June 2019 ASCO Conference was February 12, 2019.

51.     The February 2019 Offering was successful for the Company, with the Company selling nearly 6.3 million shares of MacroGenics stock to the public at $20.00 per share, generating more than $126 million in gross proceeds.

### E.     Defendants Continue to Tout the Results of the SOPHIA Study

52.     On February 26, 2019, MacroGenics filed its Annual Report on Form 10-K with the SEC (the "2018 10-K").  Defendants Koenig and Karrels each signed the 2018 10-K.

53.     In the 2018 10-K, MacroGenics again touted the SOPHIA results, repeating statements that had been made in the February 6 Press Release and Offering Documents as follows:

> In February 2019, we announced positive results from SOPHIA, our Phase 3 clinical trial of margetuximab in HER2-positive metastatic breast cancer patients. ***The SOPHIA clinical trial met the trial's first primary endpoint of prolongation of progression-free survival (PFS) in patients treated with the combination of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy.*** Patients in the margetuximab arm experienced a 24% risk reduction in PFS compared to patients in the trastuzumab arm (HR=0.76, p=0.033). Notably, approximately 85% of patients in the study were carriers of the CD16A (FcγRIIIa) 158F allele, which has been previously associated with diminished clinical response to trastuzumab and other antibodies. In this pre-specified subpopulation, patients in the margetuximab arm experienced a 32% risk reduction in PFS compared to patients in the trastuzumab arm (HR=0.68, p=0.005). ***Results of the SOPHIA study have been submitted for presentation later this year at a major scientific conference.*** Follow-up for determination of the impact of therapy on the sequential second primary endpoint of overall survival (OS) is ongoing, as pre-specified in the study protocol and recommended by the trial's independent Data Safety Monitoring Committee.

[Emphasis added.]

54.     The 2018 10-K also said, "clinical data from our Phase 3 SOPHIA study of Margetuximab demonstrated an improvement in activity over that of trastuzumab."

55.     MacroGenics held a conference call on February 26, 2019, to discuss the Company's 2018 "Fourth Quarter and Full Year Corporate Progress and Financial Results." Both Defendant Koenig and Karrels participated in the call, with both presenting statements and answering questions. On that call, CEO Koenig stated, in pertinent part:

> As noted in our earlier announcement, ***it is too early to evaluate the sequential secondary primary endpoint to overall survival, as OS events continue to accrue in the study population.***
>
> We plan to meet with the FDA in the first half of 2019 and anticipate submitting a biologics licensing application to the FDA on the basis of the PFS results in the second half of 2019. ***We have already submitted an abstract containing previously disclosed as well as additional results to the ASCO meeting in June.*** In this regard, we are currently reviewing options and strategies for commercialization, assuming margetuximab receives FDA approval in this indication.

[Emphasis added.]

56.     On May 1, 2019, MacroGenics issued a press release, entitled "MacroGenics Provides Update on Corporate Progress and First Quarter 2019 Financial Results" (the "May 1 Press Release"), which stated, in part:

> In February, we reported topline results from SOPHIA showing that in the Phase 3 trial, progression-free survival was prolonged following treatment with margetuximab and chemotherapy compared to trastuzumab with chemotherapy. We look forward to presenting detailed results as ASCO. . . .
>
> An abstract containing data from SOPHIA was selected for presentation in an oral session to be held on Tuesday, June 4, 2019 at the American Society of Clinical Oncology (ASCO) Annual Meeting.

57.     Later that day, the Company held its quarterly earnings conference call for the first quarter of 2019 (the "1Q2019 Call"), in which both Defendant Koenig and Karrels participated with both presenting statements and answering questions. In particular, Defendant Koenig reiterated on the call that "[a]n abstract describing the SOPHIA results has been accepted for an oral presentation at the annual meeting of the American Society of Clinical Oncology, or ASCO,

to be held in June," adding that: "we believe that the Phase III results in metastatic HER2-positive breast cancer . . . provide clinical validation of our Fc-optimization platform."

58.     The 1Q2019 Call also included the following colloquy between analyst John Barrett (of SVB Leerink LLC) and Defendant Koenig:

> [Analyst:]     Can you please help set investor expectations ahead of the ASCO update, and specifically what sort of data will be presented, and *will you have survival data in the ASCO presentation*?
>
> [Koenig:]     Thank you, John, for that question. Obviously *we're very excited about being able to disclose additional data from the SOPHIA trial*. There will be obviously an abstract coming out in mid-May, and this will be followed up obviously with a presentation on the morning of June 4. Our expectation is obviously to provide a recapping of the data we presented on the intent-to-treat population, on various subset populations, particularly looking at the F allele 158 population where we've seen the significant response rate. *And we will likely present the OS data at that point, which was disclosed or examined at the time of February 5 when we had our initial data*. There will be analysis of different subsets that were defined as secondary endpoints. And I presume that -- that data presentation has not obviously been put together yet, but it should be very revealing in terms of where we think the promise of this drug is.

[Emphasis added.]

59.     Koenig also added that "it is too early to evaluate the second sequential primary endpoint of overall survival as OS events continue to accrue in the study population" and neither the May 1 Press Release nor the Company's comments during the 1Q2019 Call gave out any OS data.

60.     On May 15, 2019, after the close of financial markets, MacroGenics issued additional positive news about SOPHIA.  In a press release titled "MacroGenics Announces Positive Results from Phase 3 SOPHIA Study of Margetuximab in Patients with HER2-Positive Metastatic Breast Cancer" (the "May 15 Press Release"), the Company reiterated that SOPHIA had met its "first sequential primary endpoint" of showing superior PFS in a "head-to-head" study against "the current standard of care [Trastuzumab]."  The Company also disclosed for the first

time that "[t]he median PFS of patients treated with Margetuximab and chemotherapy was 5.8 months compared to 4.9 months in patients treated with trastuzumab and chemotherapy," an improvement of 0.9 months.

61.     The May 15 Press Release also disclosed, for the first time, that the Company had performed an "interim" analysis on the OS data it had as of the October 10, 2018 cut-off.   In pertinent part, the release said:

> At the time of the primary PFS analysis, overall survival (OS) data based on 158 events were immature. The median OS at that time was prolonged by 1.7 months in patients treated with margetuximab and chemotherapy compared to patients treated with trastuzumab and chemotherapy.  For the exploratory subpopulation of patients carrying the CD16A 158F allele, the median OS was prolonged by 6.8 months in the margetuximab arm compared to the trastuzumab arm.

62.     In the May 15 Press Release, Defendant Koenig also said:

> **The activity observed to date in SOPHIA is promising**. Of note, this is the first randomized Phase 3 study that was designed to examine the potential benefit of Fc modification and the role of Fc-gamma receptor genotypes on anti-HER2 antibody efficacy. **For overall survival, we anticipate the preliminary positive trend in favor of Margetuximab to continue**, although subsequent results could fluctuate as additional events accrue.

[Emphasis added.]

63.     Overall, financial markets reacted positively to Defendants' additional disclosures regarding SOPHIA's results.  The statements in the May 15 Press Release caused MacroGenics' stock to increase from $16.27 per share at the close on May 15, 2019, to close at $18.00 on May 16 and $18.71 on May 17 – which represented a one-day increase of $1.73 (**or more than 10.6**%) and a two-day increase of $2.44 (**or 15.0%**).

## IV.     THE UNDISCLOSED ADVERSE FACTS BEGIN TO PUBLICLY EMERGE

64.     At the June 4, 2019 ASCO Conference, the Company presented data from the SOPHIA study, as of the October 10, 2018 data cut-off.  As Defendants had previously disclosed, the Company's ASCO presentation of the SOPHIA data showed a statistically significant

improvement in PFS in for patients treated with Margetuximab (plus chemotherapy) compared to those treated with Trastuzumab (plus chemotherapy) in the ITT population, based on 265 PFS events. More specifically, the SOPHIA data presented at the ASCO Conference showed a median PFS=5.8 months for those treated with Margetuximab (plus chemotherapy) versus 4.9 months for those treated with Trastuzumab (plus chemotherapy); it also showed a hazard ratio ("HR") equal to 0.76; a 95% confidence interval ("CI") of 0.59-0.98; and a "P-value of 0.033."[5]  In the subgroup, PFS was prolonged by 1.8 months in the Margetuximab arm compared to the Trastuzumab arm (median PFS=6.9 months for Margetuximab versus 5.1 months for Trustuzumab; HR=0.68; 95% CI: 0.52-0.90; P=0.005).

65.     Also at the June 2019 ASCO Conference, the Company, for the first time, presented important new OS data from its first interim analysis of the SOPHIA data, based on 158 OS events, which was also based on the October 2018 cut-off data.  This interim analysis was not expected to, and did not, reach statistical significance as the data was "cut-off" as of a relatively early stage for purposes of drawing definitive conclusions.  However, the results existed and were (obviously) deemed sufficiently important to be presented at ASCO's annual meeting – which is arguably the premier annual gathering of oncologists and oncology researchers in the United States.

66.     At the ASCO Conference, the Company further disclosed that for the ITT patient population, the median OS was 18.9 months in the Margetuximab arm versus 17.2 months in the Trastuzumab arm (HR=0.95; 95% CI: 0.69-1.31) and that in the pre-specified exploratory

---

[5]      The "P-value" is a measure of statistical significance; a P-value below 0.05 is generally considered to be a reliable measure of statistical significance.

subpopulation of patients carrying the CD16A 158F allele, the median OS was 23.6 months in the

Margetuximab arm versus 16.9 months in the Trastuzumab arm (HR=0.82; 95% CI: 0.58-1.17).[6]

      67.     However, the Company's presentation at the ASCO Conference also disclosed, for

the first time, graphs that plotted the OS data in the form of so-called Kaplan-Meier curves.  This

critically important data showed the following:





      68.     By way of background, in 1958, Drs. Edward L. Kaplan and Paul Meier published

a seminal paper describing how "Kaplan-Meier curves" can be used to deal with differing survival

times when not all study participants continue to the end of a given clinical study.  *See* E.L. Kaplan

& P. Meier, *Nonparametric Estimation from Incomplete Observations*, 53 J. Am. Stat. Ass'n 457

(1958).  Drs. Kaplan and Meier's academic research also discussed how the ability to properly

analyze survival times is critical in the analysis of certain types of studies, such as in cancer

treatment trials.  One indication of how basic and fundamental Kaplan-Meier curves are to

evaluating OS data is the fact that in the very narrow time window available for presentations at

---

[6]     That the high ends of the CI exceeded 1.0 in both instances is one indicator that the
observed 1.7 month and 6.7 month increases in OS for the "full" and "subpopulation" groups,
respectively, were both ***not*** statistically significant.

ASCO's annual meetings, the presenters included Kaplan-Meier curves using the October cut-off data from the SOPHIA study.

69.     To graph Kaplan-Meier curves, one simply needs to have the study data concerning the number of ITT patients who, over a relevant time interval, have either survived or died.  As noted above, this binary categorization does not involve the kind of complications involved in determining whether a given patient has survived "with or without" progression of their cancer. In the case of the SOPHIA study, to generate the kind of standard Kaplan-Meier curves presented at the June 2019 ASCO Conference one need only know: (a) the number of patients originally enrolled in each arm of the trial (*i.e.*, as of the date they were "randomized" into either the Margetuximab arm or Trastuzumab arm; and (b) whether those patients were still alive or had died as of a particular cut-off date (here, the pre-specified October 10, 2018 cut-off date).

70.     The OS rate is calculated from this data, but the value of a Kaplan-Meier curve is that it plots the observed OS rate over time, thereby allowing one to better assess whether and to what extent the OS data – and particularly early and still "maturing" OS data – is in fact "on track" to show that OS differences between two treatment groups are actually statistically significant. For example, to use simplified hypothetical numbers, if at the end of the first month of a study, 0 out of the 1,000 individuals in a hypothetical "Treatment M" arm of a study died, while 1 out of 1,000 individuals in the hypothetical "Treatment T" arm of the same study died, the OS rates at the end of that first month would be ***100%*** for patients in the M cohort and ***99.9%*** (999 out of 1,000) for those in the T cohort – resulting in a difference of 0.1%.  If, at the end of the second month, 2 out of the 1,000 patients in the M cohort died, while 4 out of the remaining 999 T cohort patients died, the OS rate after two months would be 99.8% (998 out of 1,000) for the M cohort and 99.5% for the T cohort – resulting in a difference of 0.3%.  And if after the third month, another

1 of the remaining 998 patients in the M cohort died, while another 4 out of the remaining 995 T cohort patients died, the OS rate after two months would be 99.7% (997 out of 1,000) for the M cohort and 99.1% for the T cohort – resulting in a difference of 0.6%.

71.     Because death is final, OS rates will inevitably *decline* over time and the best that can be hoped for between any two successive months is that the OS rate for a cohort will simply stay flat (which would occur if there were no new deaths in that cohort in the latter month of any given two-month period).  The "always down or flat" trajectory of any given Kaplan-Meier curve is, for example, illustrated by the chart at ¶67 above.

72.     However, to return to the hypothetical above, there can be no assurance that a "favorable" disparity in OS rates for patients in the M cohort (and comparable "unfavorable" disparity in OS rates for patients in the T cohort) will continue after month 3 (or month 4, or month 5, etc.) – let alone reach a sufficiently large quantum of disparity as to be meaningful (or statistically significant) over a much longer period of, say, 24 months (two years) or more. Moreover, doctors and patients will, for obvious reasons, typically consider it much more important to know the extent to which a given treatment (compared to an alternative) is more likely to have a high OS rate *after two years* (*i.e.*, extend their life by two years), rather than the extent to which a given treatment is more likely to extend their life by just *two months*.  Accordingly, in evaluating OS data that has not yet fully "matured" over several years, it is highly material to know whether the plotting of OS data over time (a) *consistently* shows a favorable difference (*i.e.*, higher OS rate) for Treatment M compared to Treatment T; and (b) shows that the *size* of that difference is increasing over longer periods of time – or whether, instead, that difference is shrinking or, worse still, "reversing" over time.  This latter "reversing" scenario (which would be the worst case

for hypothetical treatment M) would be one in which after, say, two years, the data indicated that treatment T would actually be more likely to prolong life beyond two years.

73.     As noted, the distance between the Kaplan-Meier OS curves in the above hypothetical can be said to be increasing or "widening" over the first three months because the **difference** in the OS rate for the M versus T cohorts **increased** from 0.1% to 0.3% to 0.6%, respectively, after the end of the first, second, and third months.  A steady, meaningful widening of the OS Kaplan-Meier curves in the above hypothetical over the next 12, 24, or more months would be seen as a highly positive result in a cancer trial like SOPHIA.  By contrast, curves that grow closer together, or which "cross" – and especially those that cross into "reversal" territory after longer periods – are **unfavorable**, as they constitute a clear indication that the OS data is **not** "on track" to generate a meaningful or statistically significant OS result when the data is fully "matured" and a "red flag" for investors.

74.     Unfortunately, the actual OS data and related Kaplan-Meier graphs from the SOPHIA trial that MacroGenics belatedly revealed at the June 2019 ASCO Conference were **unfavorable** and showed that the SOPHIA trial was **_not_** on track to show that Margetuximab would result in a meaningfully higher overall survival rate than Trastuzumab once the study's OS data had fully "matured."  In particular, as is readily apparent from a review of the Kaplan-Meyer curves presented at the June 2019 ASCO Meeting (*see* ¶67 above), (a) the curves either overlapped or "crossed" at multiple points in time as one moves left-to-right along the x-axis; and (b) the curves not only crossed, but began to separate favorably to Trastuzumab and **unfavorably** against Margetuximab after roughly 24 months (two years).  Both the overlapping and crossing of the two arms, as well as the fact that Trastuzumab was producing much better OS results than

26

Margetuximab after 24 months, were materially adverse facts that were not disclosed to the public until the June 2019 ASCO Conference, but were known to Defendants throughout the Class Period.

75.     Within hours of the release of this OS data, on June 4, 2019, Evercore ISI issued an analyst report, which described this fuller SOPHIA trial data as yielding only "underwhelming OS so far."  As the Evercore ISI report further stated:

> When MGNX reported +ve [positive] PFS in SOPHIA, *there was a lot of investor concern that ~1 mo PFS benefit may translate to an OS benefit*.
>
> *However, the ASCO abstract took the expectations up meaningfully*: although immature, the median OS was tracking at a 1.7 mo[nth] absolute benefit as per abstract.
>
> And then we get to the actual presentation today: immature OS HR is 0.95 in the ITT group (although the CD16A-158F carrier group is HR of 0.82) - all non stat sig obviously given the # of events. . . .
>
> First interim was 41% of events, and there is a second interim expected later in the year.  *The OS curve crosses multiple times, which isn't how the PFS behaved*.

[Emphasis added.]

76.     Similarly, the following day, June 4, 2019, Cowen Inc. issued an analyst report commenting on the June 2019 ASCO Presentation, entitled "SOPHIA Shows Disappointing PFS, Focus shifts to OS," which stated:

> SOPHIA data was presented at ASCO.  We believe the stock weakness after the presentation was due to investor concern about the magnitude of PFS benefit and initial OS signal, which only included 41% of required events. . . .
>
> **OS Differentiation Remains Critical for Margetuximab**
>
> The SOPHIA trial data were presented at ASCO, which was followed by an investors call.  The trial previously announced positive results for margetuximab + chemo (MC) in HER2+ metastatic breast cancer over trastuzumab + chemo (TC). We believe the stock's weakness yesterday was caused by investor concerns about limited OS curve separation.  As of an October 2018 cutoff date MacroGenics reported that OS data remained immature with only 41% (158/385) of events required for final OS data analysis occurring.  At the time of analysis the ITT population reported an (18.9 vs. 17.2 months mOS in MC vs. TC ([HR], 0.95; 95%

CI, 0.69-1.31), with CD16A/FF or FV allele [sic] reporting an (23.6 vs. 16.9 months) mOS in MC vs. TC ([HR], 0,82, 95% CI, 0.58-1.17).

77.     Moreover, as reported by *Vantage* in a June 5, 2019 article, entitled "Reality bites for Macrogenics," investors were probably feeling "pretty peeved" as a result of the "unattractive" Kaplan-Meier curves for the SOPHIA OS analysis.  Specifically, *Vantage* noted, "[t]he sting in this case came in the form of survival curves . . . [with] curves [that] separated relatively late in the analysis and crossed several times."

78.     In response to the material adverse news concerning SOPHIA's OS data that was belatedly disclosed in the Company's presentation at the June 2019 ASCO Conference and subsequent negative commentary, the price of MacroGenics common stock: (a) tumbled $3.13 per share to close at $15.58 per share on June 4, 2019, in heavy trading, ***reflecting a stunning one-day decline of nearly 17%*** from the previous close; and (b) fell an ***additional*** $0.92 per share (or a further 5.9%), to only $14.66 per share at the close on June 5.  ***In total, the price of MacroGenics common stock fell $4.05 per share over these two days, representing a combined two-day decline of nearly 22%.***

79.     As a result of Defendants' materially false and misleading statements and material omissions, MacroGenics common stock traded at artificially inflated prices during the Class Period.  As the full truth concerning the OS analysis of the SOPHIA October cut-off data was disclosed, the Company's stock price plunged at the end of the Class Period by roughly 43% from its Class Period high and by nearly 27% from the February 2019 Offering price.  Plaintiff now brings its claims under this Part One of the Complaint, on behalf of itself and the proposed Class, to obtain a recovery for the economic harm and damages that Defendants' violations of the Exchange Act have caused Plaintiff and the other members of the Class.

## V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

80.    On February 6, 2019, MacroGenics issued the February 6 Press Release, entitled "MacroGenics Announces Positive Results from Pivotal Phase 3 SOPHIA Study of Margetuximab," which stated, in part:

> The SOPHIA clinical trial met the primary endpoint of prolongation of progression-free survival (PFS) in patients treated with the combination of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy. Patients in the margetuximab arm experienced a 24% risk reduction in PFS compared to patients in the trastuzumab arm (HR=0.76, p=0.033).  Notably, approximately 85% of patients in the study were carriers of the CD16A (FcγRIIIa) 158F allele, which has been previously associated with diminished clinical response to HERCEPTIN [Trastuzumab] and other antibodies.  In this pre-specified subpopulation, patients in the margetuximab arm experienced a 32% risk reduction in PFS compared to patients in the trastuzumab arm (HR=0.68, p=0.005).  ***Results of the SOPHIA study are being prepared for submission for publication and presentation later this year at a major scientific conference.  Follow-up for determination of the impact of therapy on the sequential primary endpoint of overall survival (OS) is ongoing, as pre-specified in the study protocol and recommended by the trial's independent Data Safety Monitoring Committee*** . . . .
>
> "We are pleased with the SOPHIA clinical results and are especially grateful to the patients, their caregivers, trial investigators and site personnel who participated in the study" [. . .] said Scott Koenig, M.D., Ph.D., MacroGenics' President and CEO.  "Our Fc-engineered, immune-enhanced molecule has demonstrated a ***superior outcome in a head-to-head study against HERCEPTIN [Trastuzumab].  We look forward to additional opportunities to develop margetuximab*** in other HER2-positive breast and gastric cancer populations."

[Emphasis added.]

81.    The Company also held a conference call later that day, in which both Defendants Koenig and Karrels participated and during which CEO Koenig reiterated that the SOPHIA clinical trial had met the primary endpoint of prolongation of PFS in patients treated with Margetuximab compared to those treated with Trastuzumab.  Defendant Koenig further stated that:

> The results of the SOPHIA study are being prepared for submission – for publication and presentation later this year at a major scientific conference. Follow-up for determination of the impact of therapy on the sequential primary endpoint of

overall survival is ongoing as prespecified in the SOPHIA study protocol and recommended by the Data Safety Monitoring Committee.

Let me remind listeners that ***there are currently no approved therapies for the treatment of metastatic breast cancer patients who were previously treated with HERCEPTIN [Trastuzumab]***, Perjeta and Kadcyla. ***In this study, MacroGenics demonstrated a superior outcome in a head-to-head study against [Trastuzumab],*** and we're anticipating submitting a BLA to the U.S. FDA in the second half of 2019.

[G]iven that this is a highly overtreated population ***and we're still seeing positive results***, the ability to now move this up the line of therapy for breast cancer as well as for other HER2-positive tumors, I think provides us with greater upside opportunity for a commercial market for Margetuximab.

[Emphasis added.]

82.     In addition, when asked by an analyst whether, with respect to "overall survival," he could "***[share] any trends . . . with us or [share] how many events have already happened?***", Defendant Koenig responded, in pertinent part, by stating, "***trending for OS has been positive in the direction of margetuximab, but we just don't have enough events to be able -- to have significance here***. So we'll continue to follow that, but everything, so far, is consistent with the biological activity of the molecule."  [Emphasis added.]

83.     The statements in ¶¶80-82 above were all materially untrue, incomplete and misleading, and omitted material adverse information that was required to be disclosed because, as Defendants knew, each of these statements failed to disclose that the then-existing analysis of the data existing as of the October 2018 cut-off date showed that the SOPHIA data was: (a) ***not*** on track to support an ultimate finding that Margetuximab provided a statistically significant improvement in OS compared to Trastuzumab; (b) ***not*** on track to show that Margetuximab would meet one of the SOPHIA study's two primary endpoints, namely a statistically significant improvement in patient OS compared to Trastuzumab; and that accordingly, (c) the prospects for relatively broad use and commercialization of Margetuximab, and the Company's ultimate

revenue, net sales, and net income (profit) prospects associated with Margetuximab, were materially less (and materially more uncertain) than a reasonable investor would have believed absent disclosure of the adverse information.

84.     In the (supplemental) February 12, 2019 Prospectus, incorporated by reference into and made a part of the Offering Documents (and signed by Defendants Koenig and Karrels), Defendants stated, in pertinent part, as follows:

> The SOPHIA clinical trial met the trial's first primary endpoint of prolongation of progression-free survival (PFS) in patients treated with the combination of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy. Patients in the margetuximab arm experienced a 24% risk reduction in PFS compared to patients in the trastuzumab arm (HR=0.76, p=0.033). . . .

> Results of the SOPHIA study are being prepared for submission for publication and presentation later this year at a major scientific conference.  Follow-up for determination of the impact of therapy on the sequential second primary endpoint of overall survival (OS) is ongoing, as pre-specified in the study protocol and recommended by the trial's independent Data Safety Monitoring Committee.

The Offering Documents also incorporated by reference the contents of the Company's February 6 Press Release, which had been previously filed with the SEC as an annex to a Form 8-K on February 6, 2019.

85.     The statements in the February 6 Press Release that were incorporated by reference into the Offering Documents were materially untrue, incomplete and misleading, and omitted material adverse information that was required to be disclosed, for the reasons stated above in ¶83. In addition, the statements in the Offering Documents that referenced the positive results of the SOPHIA study, and that advised that "follow-up" work relating to the impact of Margetuximab therapy "is ongoing," were also materially untrue, incomplete and misleading, and omitted material adverse information because they concealed material adverse information concerning Margetuximab, and in particular, that each of these statements failed to disclose that the then-existing analysis of the data existing as of the October 2018 cut-off date showed that the SOPHIA

data: (a) was **_not_** on track to support an ultimate finding that Margetuximab provided a statistically significant improvement in OS compared to Trastuzumab; (b) was **_not_** on track to show that Margetuximab would meet one of the SOPHIA study's two primary endpoints, namely a statistically significant improvement in patient OS compared to Trastuzumab; and that accordingly, (c) the prospects for relatively broad use and commercialization of Margetuximab, and the Company's ultimate revenue, net sales, and net income (profit) prospects associated with Margetuximab, were materially less (and materially more uncertain) than a reasonable investor would have believed absent disclosure of the adverse information.

86.     In addition, the Offering Documents contained a recitation of purported "Risk Factors" associated with investing in MacroGenics common stock, including the following:

> We may publicly disclose topline or interim data from time to time, which is based on preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change following a more comprehensive review of the data related to a particular study or trial. ***For example, we recently announced top line data for the SOPHIA trial of margetuximab for the treatment of certain metastatic breast cancer patients. We make assumptions, estimations, calculations and conclusions as part of our analysis of data, and we _may_ not have received or had the opportunity to fully and carefully evaluate all data. As a result, the topline results that we report _may_ differ from future results of the same studies, _or different conclusions or considerations may qualify such results_, once additional data have been received and fully evaluated.***

[Emphasis added.]

87.     However, this purported "risk factor" warning was itself materially false and misleading because it failed to disclose that the Company was already in possession of adverse and then-existing Kaplan-Meier analysis of the data existing as of the October 2018 cut-off date, which showed that the SOPHIA data: (a) was **_not_** on track to support an ultimate finding that Margetuximab provided a statistically significant improvement in OS compared to Trastuzumab; (b) was **_not_** on track to show that Margetuximab would meet one of the SOPHIA study's two primary endpoints, namely a statistically significant improvement in patient OS compared to

Trastuzumab; and that accordingly, (c) the "risk" that SOPHIA "might" generate adverse OS data in the future that would materially affect a reasonable investor's assessment of the prospects for relatively broad use and commercialization of Margetuximab (and related future revenues, net sales, and net income) was, unbeknownst to investors, ***not*** merely a "risk," but had in fact already materialized.

88.     On February 26, 2019, MacroGenics filed its 2018 10-K, which both Defendants Koenig and Karrels signed.  In the 2018 10-K, Defendants again touted the SOPHIA results, repeating statements that had been made in the February 6 Press Release and Offering Documents as follows:

> In February 2019, we announced positive results from SOPHIA, our Phase 3 clinical trial of margetuximab in HER2-positive metastatic breast cancer patients. The SOPHIA clinical trial met the trial's first primary endpoint of prolongation of progression-free survival (PFS) in patients treated with the combination of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy. . . .  Results of the SOPHIA study have been submitted for presentation later this year at a major scientific conference. Follow-up for determination of the impact of therapy on the sequential second primary endpoint of overall survival (OS) is ongoing, as pre-specified in the study protocol and recommended by the trial's independent Data Safety Monitoring Committee.

These statements were also materially untrue, incomplete and misleading, and omitted material adverse information required to be disclosed for the same reasons as stated above in ¶83.

89.     During MacroGenics' conference call later that day, on February 26, 2019, Defendant Koenig stated: "As noted in our earlier announcement, it is too early to evaluate the sequential secondary primary endpoint to overall survival, as OS events continue to accrue in the study population."  This statement was also materially untrue, incomplete and misleading, and omitted material adverse information required to be disclosed for the same reasons as stated above in ¶83.

90.     On May 1, 2019, MacroGenics issued the May 1 Press Release, stating, in part:

In February, we reported topline results from SOPHIA showing that in the Phase 3 trial, progression-free survival was prolonged following treatment with margetuximab and chemotherapy compared to trastuzumab with chemotherapy. We look forward to presenting detailed results as ASCO. . . .

An abstract containing data from SOPHIA was selected for presentation in an oral session to be held on Tuesday, June 4, 2019 at the American Society of Clinical Oncology (ASCO) Annual Meeting.

91.     Later that day, the Company held the 1Q2019 Call, which both Defendant Koenig and Karrels participated in.  In particular, Defendant Koenig reiterated on the call that "[a]n abstract describing the SOPHIA results has been accepted for an oral presentation at the annual [ASCO] meeting . . . to be held in June[,]" adding that "we believe that the Phase III results in metastatic HER2-positive breast cancer and the Phase II results in HER2-positive gastric cancer provide clinical validation of our Fc-optimization platform."

92.     The preceding statements in ¶¶88-91 were also materially untrue, incomplete and misleading, and omitted material adverse information required to be disclosed for the same reasons as stated above in ¶83.

93.     On May 15, 2019, MacroGenics issued additional positive news about SOPHIA in the May 15 Press Release entitled, "MacroGenics Announces Positive Results from Phase 3 SOPHIA Study of Margetuximab in Patients with HER2-Positive Metastatic Breast Cancer."  In this release, the Company reiterated that SOPHIA had met its "first sequential primary endpoint" of showing superior PFS in a "head-to-head" study against the "current standard of care [Trastuzumab]."  The May 15 Press Release also disclosed, for the first time, that the Company had performed an "interim" analysis on the OS data it had as of the October 10, 2018 cutoff, stating, in pertinent part, that:

At the time of the primary PFS analysis, overall survival (OS) data based on 158 events were immature.  The median OS at that time was prolonged by 1.7 months in patients treated with margetuximab and chemotherapy compared to patients treated with trastuzumab and chemotherapy.  For the exploratory subpopulation of

patients carrying the CD16A 158F allele, the median OS was prolonged by 6.8 months in the margetuximab arm compared to the trastuzumab arm.

94.     Defendant Koenig also stated in the May 15 Press Release that:

> *The activity observed to date in SOPHIA is promising*.  Of note, this is the first randomized Phase 3 study that was designed to examine the potential benefit of Fc modification and the role of Fc-gamma receptor genotypes on anti-HER2 antibody efficacy.  *For overall survival, we anticipate the preliminary positive trend in favor of Margetuximab to continue, although subsequent results <u>could</u> fluctuate as additional events accrue.*

[Emphasis added.]

95.     The statements in ¶¶93-94 above were all materially untrue, incomplete and misleading, and omitted material adverse information that was required to be disclosed for the reasons stated in ¶83.  In particular, as Defendants knew, each of these statements failed to disclose that the then-existing Kaplan-Meier analysis of the data existing as of the October 2018 cut-off date showed that the SOPHIA data: (a) was <u>***not***</u> on track to support an ultimate finding that Margetuximab provided a statistically significant improvement in OS compared to Trastuzumab; (b) was <u>***not***</u> on track to show that Margetuximab would meet one of the SOPHIA study's two primary endpoints, namely a statistically significant improvement in patient OS compared to Trastuzumab; and that accordingly, (c) the prospects for relatively broad use and commercialization of Margetuximab, and the Company's ultimate revenue, net sales, and net income (profit) prospects associated with Margetuximab, were materially less (and materially more uncertain) than a reasonable investor would have believed absent disclosure of the adverse information.  Indeed, the then-existing, but as yet undisclosed, Kaplan-Meier analysis materially contradicted and undermined Defendant Koenig's affirmative assertions that "[t]he activity observed to date in SOPHIA is promising" and that "[f]or overall survival, [the Company] anticipate[s] the preliminary positive trend in favor of Margetuximab to continue."  Moreover, Koenig's further "risk warning" statement that "subsequent results *could* fluctuate as additional

events accrue" was also materially misleading because the "risk" that SOPHIA "could" fluctuate as additional events accrue was, unbeknownst to investors, *not* merely a "risk," but had in fact already materialized.

## VI.    FRAUDULENT SCHEME AND ADDITIONAL SCIENTER ALLEGATIONS

96.    MacroGenics and the Officer Defendants are liable under the Exchange Act for making materially false, incomplete, or misleading statements and failing to disclose adverse facts known to them about MacroGenics' SOPHIA study that they had a duty disclose (a) in order to make their affirmative statements not materially misleading; (b) in order to make their statements concerning the SOPHIA trial and the state of its OS data materially true, full, and complete; and, (c) with respect to statements made in SEC-filed documents, in order to meet their obligations to adequately disclose material adverse events, trends, or uncertainties under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303").  In addition, Defendant Karrels is also liable for the materially false, incomplete, and misleading statements made by Defendant Koenig during the above-referenced conference calls, in which Karrels was also a participant, based on Karrel's failure to correct Koenig's actionable misstatements and omissions.

97.    Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of MacroGenics common stock was a success, as it: (a) deceived the investing public regarding MacroGenics' business and financial results; (b) artificially inflated the price of MacroGenics common stock, including at the time of the February 2019 Offering; and (c) caused Plaintiff and other members of the Class to purchase MacroGenics common stock at artificially inflated prices.

98.    During the Class Period, Defendants had the motive and opportunity to commit fraud and violate the Exchange Act.  Indeed, on February 13, 2019, within one week of the Company's stock price skyrocketing over 130% after the dissemination of the false and misleading

statements detailed herein, MacroGenics and the Officer Defendants launched the Company's secondary public offering of over 6.3 million shares of its common stock, pursuant to which the Company raised over $126 million in gross proceeds.  But for Defendants' materially false and misleading statements and material omissions regarding the SOPHIA trial, which began immediately prior to the February 2019 Offering (and which helped cause the price of MacroGenics common stock to *more than double*), the Company would have had to issue significantly more common stock to raise the same amount of capital from investors – assuming that it would have been able to raise additional monies from capital markets at all without causing unacceptable dilution of its existing shareholders.

99.    Defendants also had actual knowledge of the materially false, misleading, and incomplete nature of the statements they made and/or acted in reckless disregard of the true information known to them at the time.  Indeed, during its June 4, 2019 ASCO Presentation, the Company acknowledged that the PFS and OS analyses were conducted using patient data from the SOPHIA trial that had been cut-off as of October 10, 2018.  By making materially false, misleading, and incomplete statements about the data emerging from the SOPHIA trial throughout the Class Period, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of conduct that operated as a fraud or deceit on purchasers of MacroGenics common stock.

100.    For reasons discussed above in ¶38, a strong inference exists that the adverse Kaplan-Meier data existed and had been prepared and internally unblinded no later than – and indeed likely well before – the preparation and *public* announcement of the initial SOPHIA PFS data on February 6, 2019.  And it defies credulity that Defendants Koenig and Karrels, as the Company's CEO and CFO, respectively, would not have been aware of such basic and material

adverse information promptly after it was prepared, particularly as it concerned what was arguably the Company's single most important product.

## VII.   ADDITIONAL LOSS CAUSATION ALLEGATIONS

101.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MacroGenics common stock and operated as a fraud or deceit on acquirers of MacroGenics common stock.  As detailed above, when the truth about the misleading statements was revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up the stock's price.  The declines in the price of MacroGenics stock were the direct result of the nature and extent of Defendants' misstatements finally being revealed to investors and the market. The timing and magnitude of the share price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

102.   At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of MacroGenics' business and financial condition, as alleged herein.   Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make the statements made not false or misleading, causing the price of MacroGenics common stock to be artificially inflated.  Plaintiff

and the other Class members purchased MacroGenics common stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## VIII.   CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action (including the claims asserted under both Parts One and Two of this Complaint) as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of MacroGenics common stock during the Class Period, including those who purchased directly in the Company's February 2019 Offering (the "Class"). Excluded from the Class are Defendants and their immediate families, the directors and officers of MacroGenics and their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

104.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MacroGenics common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by MacroGenics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the Country.  Joinder would be highly impracticable.

105.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

106.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

107.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether the price of MacroGenics common stock during the Class Period was artificially inflated because of Defendants' conduct as complained of herein;

(c)    whether the Offering Documents for the February 2019 Offering, including the contents of the February 6 Press Release incorporated therein by reference, were materially false, incomplete, or misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

(d)    whether (with respect to the Exchange Act Claims) the other statements alleged herein to be actionable were materially false, incomplete, or misleading and/or omitted to disclose material adverse facts required to be disclosed therein;

(e)    whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements (with respect to the Exchange Act claims); and

(f)    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

108.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

109.    Plaintiff incorporates ¶¶1-108 by reference.

110.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

111.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of MacroGenics common stock during the Class Period.

112.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for MacroGenics common stock.  Plaintiff and the Class would not have purchased MacroGenics common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

113.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of MacroGenics common stock during the Class Period.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

114.     Plaintiff incorporates ¶¶1-113 by reference.

115.     During the Class Period, the Officer Defendants acted as controlling persons of MacroGenics within the meaning of §20(a) of the Exchange Act.  By virtue of their positions and their power to control public statements about MacroGenics, the Officer Defendants had the power and ability to control the actions of MacroGenics and its employees.  In addition, MacroGenics controlled the Officer Defendants and its other officers and employees.  By reason of such conduct and control, Defendants are liable pursuant to §20(a) of the Exchange Act.

**PART TWO:**
**CLAIMS UNDER THE SECURITIES ACT OF 1933**

**I.     SECURITIES ACT CLAIMS**

116.     In this Part Two and Counts III, IV, and V below (the "Securities Act Claims"), Plaintiff asserts strict-liability and negligence claims under §§11, 12(a)(2), and 15 of the Securities Act.  Plaintiff incorporates the above factual allegations by reference, but expressly disclaims any allegations of scienter or fraud for these Securities Act claims.  Among other things, Plaintiff disclaims the allegations of scienter or fraud in Part One above.

117.     The Securities Act Claims arise out of MacroGenics' approximately $126 million February 13, 2019 secondary public offering of 6.3 million shares of its common stock at $20.00 per share.

118.    The February 2019 Offering was conducted pursuant to a shelf Registration Statement originally filed with SEC on Form S-3 on November 2, 2016, as amended over time, to include (*inter alia*) a Prospectus and Prospectus Supplement that was filed with the SEC on February 13, 2019, together with certain other documents that were incorporated by reference, pursuant to a "shelf" registration process.  The original shelf Registration Statement was signed by Defendants Koenig and Karrels, among others.

119.    This action was brought within one year of the discovery of the untrue statements and omissions in the Offering Documents (and within one year after discovery should have been made in the exercise of reasonable diligence) and within three years of the Offering.

## II.    JURISDICTION AND VENUE

120.    The claims asserted in this Part Two of the Complaint arise under §§11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§77k, 77*l*, 77o).

121.    This Court has jurisdiction over these claims under §22 of the Securities Act (15 U.S.C. §77v).

122.    Venue is proper in this Judicial District under §22 of the Securities Act (15 U.S.C. §77v(a)).  Many of the acts and transactions alleged in this Part Two of the Complaint, including the dissemination of materially untrue and misleading statements, occurred in substantial part in this District, and MacroGenics is headquartered in this District.

123.    In connection with the acts, conduct, and other wrongs alleged in this Part II of the Complaint, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate wire and telephone communications, and facilities of the NASDAQ, a national securities exchange.

## III.    THE SECURITIES ACT PARTIES

### A.    The Securities Act Plaintiff

124.    Lead Plaintiff CPERS is an approximately $1.2 billion defined benefit fund operated for the benefit of employees in the City of Baton Rouge, as well as firefighters and police officers.  CPERS purchased MacroGenics common stock directly in the February 2019 Offering, as set forth in the certification filed with its lead plaintiff papers (ECF No. 21-2), and was damaged thereby.

### B.    The Securities Act Defendants

125.    Defendant MacroGenics is a Delaware corporation with its principal executive offices located at 9704 Medical Center Drive, Rockville, Maryland 20850.  MacroGenics common stock trades on the NASDAQ under the ticker symbol "MGNX."  MacroGenics held its initial public offering in 2013.

126.    Defendant Koenig is, and at all relevant times has been, President, CEO, and a director of MacroGenics.  Koenig signed the Registration Statement of the February 2019 Offering.

127.    Defendant Karrels is, and at all relevant times has been, CFO and Senior Vice President of MacroGenics.  Karrels signed the Registration Statement of the February 2019 Offering.

128.    Defendants Koenig and Karrels are collectively referred to herein as the "Officer Defendants," and the Officer Defendants and MacroGenics are collectively referred to herein as the "Defendants."

129.    With assistance from the Officer Defendants, the underwriting firms that the Company retained to help plan and execute the February 2019 Offering met with potential investors and presented highly favorable, but materially incorrect and/or misleading, information

about the Company, its business, products, plans, and financial prospects and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

130.    The Officer Defendants, as signatories of the Offering Documents, were also required to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation, to ensure that the Offering Documents were free of any materially inaccurate or misleading statements and free of any omissions of material fact or other matters that were required to be disclosed therein.  During the course of their "due diligence," the Officer Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

131.    In addition to having access to internal corporate documents, the Officer Defendants had access to all of the Company's other top executives, directors, and advisors to determine: (a) the strategy to best accomplish the February 2019 Offering; (b) the terms of the February 2019 Offering, including the price at which the Company's common shares would be sold; (c) the language to be used in the Offering Documents; (d) what disclosures about the Company would be made in the Offering Documents; and (e) what responses would be made to the SEC in connection with its review of the Offering Documents.  As a result of those constant contacts and communications, at a minimum, the Officer Defendants should have known of the undisclosed material misstatements, misleading statements, and omissions contained in the Offering Documents, as detailed herein.

45

## IV.    THE DEFECTIVE FEBRUARY 2019 OFFERING

### A.    The Materially False and Misleading Offering Documents

132.    On February 6, 2019, before the market opened, MacroGenics made its first announcement with results from SOPHIA.  In the February 6 Press Release, the Company touted the SOPHIA results in no uncertain terms, stating:

> The SOPHIA clinical trial **met the primary endpoint of prolongation of progression-free survival (PFS)** in patients treated with the combination of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy. Patients in the margetuximab arm experienced a **24% risk reduction in PFS** compared to patients in the trastuzumab arm (HR=0.76, p=0.033). Notably, approximately 85% of patients in the study were carriers of the CD16A (FcγRIIIa) 158F allele, which has been previously associated with diminished clinical response to HERCEPTIN [Trastuzumab] and other antibodies. **In this pre-specified subpopulation, patients in the margetuximab arm experienced a 32% risk reduction in PFS** compared to patients in the trastuzumab arm (HR=0.68, p=0.005). **Results of the SOPHIA study are being prepared for submission for publication and presentation later this year at a major scientific conference. Follow-up for determination of the impact of therapy on the sequential primary endpoint of overall survival (OS) is ongoing, as pre-specified in the study protocol and recommended by the trial's independent Data Safety Monitoring Committee.** MacroGenics anticipates submitting a Biologics License Application (BLA) to the U.S. Food and Drug Administration in the second half of 2019.
>
> *   *   *
>
> "We are pleased with the SOPHIA clinical results and are especially grateful to the patients, their caregivers, trial investigators and site personnel who participated in the study. I would also like to thank the entire MacroGenics team and our business partners who worked diligently to bring margetuximab to the clinic and execute the SOPHIA study," said Scott Koenig, M.D., Ph.D., MacroGenics' President and CEO. "Our Fc-engineered, immune-enhanced molecule **has demonstrated a superior outcome in a head-to-head study against HERCEPTIN** [Trastuzumab]. We look forward to additional opportunities to develop margetuximab in other HER2-positive breast and gastric cancer populations."

[Emphasis added.]

133.    The Company promptly filed this press release with the SEC as part of a Form 8-K on February 6, 2019.

134.    On February 12, 2019, the Company announced that it intended to conduct a secondary offering of approximately 5.5 million shares of MacroGenics common stock pursuant to its existing shelf registration filings.

135.    On February 13, 2019, MacroGenics filed a Prospectus and Prospectus Supplement (collectively, the "Prospectus") with the SEC, pursuant to a "shelf" registration process.  The original shelf Registration Statement was filed on Form F-3 with the SEC on November 2, 2016. That Registration Statement, as amended from time-to-time, together with the Prospectus and certain other documents incorporated therein by reference, are collectively referred to herein as the "Offering Documents."   The documents incorporated by reference into the Offering Documents included the February 6 Press Release and related Form 8-K.

136.    The Offering Documents again touted the primary PFS results of the SOPHIA study and stated, in pertinent part, as follows:

> HER 2-positive Metastatic Breast Cancer. In February 2019, we announced positive results from SOPHIA, our Phase 3 clinical trial of margetuximab in HER2-positive metastatic breast cancer patients.   Margetuximab is an investigational immune-enhancing monoclonal antibody derived from our proprietary Fc Optimization technology platform. ***The SOPHIA clinical trial met the trial's first primary endpoint of prolongation of progression-free survival (PFS) in patients treated with the combination of margetuximab plus chemotherapy compared to trastuzumab plus chemotherapy. Patients in the margetuximab arm experienced a 24% risk reduction in PFS compared to patients in the trastuzumab arm*** (HR=0.76, p=0.033). Notably, approximately 85% of patients in the study were carriers of the CD16A (FcγRIIIa) 158F allele, which has been previously associated with diminished clinical response to trastuzumab and other antibodies. ***In this pre-specified subpopulation, patients in the margetuximab arm experienced a 32% risk reduction in PFS compared to patients in the trastuzumab arm*** (HR=0.68, p=0.005).
>
> Results of the SOPHIA study are being prepared for submission for publication and presentation later this year at a major scientific conference. ***Follow-up for determination of the impact of therapy on the sequential second primary endpoint of overall survival (OS) is ongoing, as pre-specified in the study protocol and recommended by the trial's independent Data Safety Monitoring Committee.*** We anticipate submitting a Biologics License Application (BLA) to the U.S. Food and

Drug Administration for margetuximab on the basis of the PFS results in the second half of 2019.

The SOPHIA study enrolled 536 patients at approximately 200 trial sites across North America, Europe and Asia. The study evaluated margetuximab in a Phase 3 clinical trial in patients with advanced HER-2+ breast cancer who had received at least two prior lines of antiHER-2 directed therapy in the metastatic setting, or in the case of having received (neo)adjuvant pertuzumab, at least one prior line of antiHER-2 directed therapy in the metastatic setting, and who have received at least one and no more than three prior lines of therapy overall in the metastatic setting. Patients were treated with either margetuximab or trastuzumab in combination with one of four chemotherapy agents (capecitabine, eribulin, gemcitabine or vinorelbine). All study patients had previously received trastuzumab and pertuzumab, and approximately 90% had previously received ado-trastuzumab emtansine. The combination of margetuximab and chemotherapy demonstrated acceptable safety and tolerability, comparable overall to that of trastuzumab and chemotherapy.

[Emphasis added.]

137.   The Offering Documents also stated that "[r]esults of the SOPHIA study are being prepared for submission for publication and presentation later this year at a major scientific conference" (referring to the then-approaching June 2019 ASCO Conference).  The deadline for submitting abstracts for presentations to be made at the ASCO Conference was February 12, 2019.

138.   These statements were materially untrue and misleading because the Company knew, but concealed, at the time of the Offering, adverse information concerning Margetuximab and, in particular, that the analysis based on the October 2018 cut-off date, as revealed at the ASCO Conference, showed that data from the SOPHIA trial was: (a) *not* on track to support an ultimate finding that Margetuximab provided a statistically significant improvement in OS compared to Trastuzumab (which was already established as the standard of care for breast cancer patients); (b) was *not* on track to show that Margetuximab would ultimately be able to meet one of the SOPHIA study's two primary endpoints, namely a statistically significant improvement in patient OS compared to Trastuzumab; and that accordingly, (c) the prospects for relatively broad use and commercialization of Margetuximab, and the Company's ultimate revenue, net sales, and net

48

income (profit) prospects associated with Margetuximab, were materially less (and materially more uncertain) than a reasonable investor would have believed absent disclosure of the adverse information.  In short, Defendants knew that the narrative being spun was not at all illustrative of the reality.

139.    Although these facts existed at the time of the Offering, the Company failed to disclose them.  Instead, Defendants merely included generalized "Risk Factors" in the Offering Documents.  For example, regarding "risks" related to "interim or top line data," the Offering Documents stated:

> We may publicly disclose topline or interim data from time to time, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change following a more comprehensive review of the data related to the particular study or trial. ***For example, we recently announced top line data for the SOPHIA trial of margetuximab for the treatment of certain metastatic breast cancer patients. We make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we <u>may</u> not have received or had the opportunity to fully and carefully evaluate all data***. As a result, the topline results that we report ***may*** differ from future results of the same studies, or different conclusions or considerations ***may*** qualify such results, once additional data have been received and fully evaluated. Top line data also remain subject to audit and verification procedures that ***may*** result in the final data being materially different from the preliminary data we previously published. In addition, the achievement of one primary endpoint for a trial does not guarantee that additional co-primary endpoints or secondary endpoints will be achieved. For example, the achievement by margetuximab of its co-primary endpoint for progression-free survival events in the SOPHIA trial does not indicate whether the co-primary endpoint of overall survival will be achieved.

[Emphasis added.]

140.    The Company also drew a direct link between the value of its stock and its clinical trials and results.  Under the headline, "Our stock price is likely to be volatile and the market price of our common stock after this offering may drop below the price you pay," MacroGenics listed "some of the factors that ***may*** cause the market price of our common stock to fluctuate or decrease

below the price paid in this offering," including "*results and timing of our clinical trials*." [Emphasis added.]

141.   These supposed "Risk Factors" were materially inaccurate, misleading, and/or incomplete because they suggested that there was only a contingent possibility of a problem when, in fact, the risks concerning Margetuximab and, in particular, the data from the SOPHIA trial *had already come to pass*.   By the time of the Offering, Defendants observed and had ample opportunity to carefully evaluate, but obfuscated, lackluster data showing that the SOPHIA trial was: (a) *not* on track to support an ultimate finding that Margetuximab provided a statistically significant improvement in patient OS compared to Trastuzumab (which was already established as the standard of care for breast cancer patients); and (b) was *not* on track to show that Margetuximab would ultimately be able to meet one of SOPHIA's two primary endpoints, namely a statistically significant improvement in patient OS compared to Trastuzumab.   Thus, the prospects for relatively broad use and commercialization of Margetuximab, and the Company's ultimate revenue, net sales, and net income (profit) prospects associated with Margetuximab, were materially less (and materially more uncertain) than suggested.   As a result, the "risks" described in these "Risk Factors" had already materialized (or were certain to materialize in the case of the Company's stock price) and were adversely affecting the Company's business and financial results, not merely hypothetical future possibilities.

142.   With these material deficiencies, the Company successfully sold 6,325,000 shares of MacroGenics common stock at the Offering price of $20.00 per share.   In total, the February 2019 Offering resulted in total proceeds to the Company of $118,910,000 (after deducting underwriter discounts and commissions of $7,590,000).

**B.** **Material Omissions in the Company's Offering Documents in Violation of Applicable Regulations**

143.    In addition, Item 303 imposed an independent duty on Defendants to disclose in the Offering Documents any known events, trends, or uncertainties that MacroGenics, as of the Offering, "reasonably expect[ed] will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future."  *Management's Discussion and Analysis of Financial Condition and Results of Operation*, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation*, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 29, 2003).

144.    The Offering Documents violated Item 303 by failing to disclose that, as of the Offering, Margetuximab, according to the then-existing data available to Defendants from the Company's SOPHIA study, was *not* on track to provide a statistically significant improvement in patient OS compared to Trastuzumab and was *not* on track to meet one of SOPHIA's two primary endpoints, namely a statistically significant improvement in patient OS compared to Trastuzumab.

145.    Likewise, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), imposed an independent duty on Defendants to provide, among other things, a "discussion of the most significant factors that make the offering speculative or risky."  Here, one of the most

significant factors that made the Offering speculative or risky to investors was the fact that, at the time of the Offering, Defendants had concerning OS data.

146.     Nowhere in the Offering Documents did MacroGenics disclose to investors that, as of the date of the Offering, this material known trend was occurring.  Accordingly, disclosure of these material facts were required under Item 503.

## V.     CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III
### For Violation of §11 of the Securities Act
### Against All Defendants

147.     Plaintiff incorporates ¶¶1-146 by reference.

148.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

149.     This is a non-fraud Count.  For the purpose of this Count, Plaintiff does not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

150.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

151.     Defendants named herein are strictly liable to Plaintiff and the Class for the misstatements and omissions.

152.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

153.     Defendant MacroGenics is the registrant of the securities purchased by Plaintiff and the Class.  As such, the Company is strictly liable for the materially inaccurate statements

contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, MacroGenics is liable under §11 of the Securities Act to Plaintiff and the Class.

154.   Each Officer Defendant signed the Offering Documents and caused their issuance. As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents and ensure that they were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the Offering Documents contained all facts required to be stated therein.  In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, each Officer Defendant is liable to Plaintiff and the Class.

155.   MacroGenics, as the issuer of the securities issued in the February 2019 Offering, is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.

156.   In addition, the Officer Defendants, unless they are able to carry their burden of establishing an affirmative "due diligence" defense, are also strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  The Officer Defendants each had a duty to make a

reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents.  They had a duty to ensure that such statements were true and accurate, there were no omissions of material facts that would make the Offering Documents misleading, and the Offering Documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Officer Defendants should have known of the material misstatements and omissions contained in the Offering Documents and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, each of the Officer Defendants is also liable to Plaintiff and the Class.

157.    Defendants acted negligently in preparing the Offering Documents.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for a belief that the statements contained in the Offering Documents were true and without omission of any material facts and were not misleading.  In alleging the foregoing, Plaintiff specifically disclaims any allegation of fraud.

158.    By reason of the conduct alleged herein, each Defendant named in this Count violated §11 of the Securities Act.

159.    None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

160.    Plaintiff acquired the Company's ordinary shares pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein.

Plaintiff sustained damages, and the price of the Company's ordinary shares declined substantially due to material misstatements and omissions in the Offering Documents.

161.     This Count is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the February 2019 Offering.

162.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

### COUNT III
### For Violation of §12(a) of the Securities Act
### Against All Defendants

163.     Plaintiff incorporates ¶¶1-162 by reference.

164.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77*l*(a)(2), on behalf of the Class, against all Defendants.  Section 12(a)(2) gives rise to liability as to "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C.§77*l*(a)(2).  Liability for a violation of §12(a)(2) extends to those, at a minimum, who passed title to the security to the purchaser, as well as those who solicited the purchase.

165.     This is a non-fraud Count.  For the purpose of this Count, Plaintiff does not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

166.     Defendants named in this Count were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the defective Offering Documents. Defendants issued, or caused to be issued, the Prospectus, which was used to induce investors,

such as Plaintiff and the other members of the Class, to purchase the Company's common shares. Defendants solicited the purchase of securities motivated at least in part by a desire to serve their own financial interests.

167.     The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.   The actions of solicitation by the Defendants named in this Count included participating in the preparation of the false and misleading Prospectus and marketing of MacroGenics shares to investors, such as Plaintiff and the other members of the Class.

168.     Defendants named in this Count owed to the purchasers of MacroGenics shares, including Plaintiff and the other members of the Class, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.   By virtue of each of these Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material facts and omissions of material facts necessary to make statements therein not misleading.

169.     Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus.

170.     MacroGenics, as the issuer of the securities issued in the February 2019 Offering, is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.

171.     In addition, the Officer Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the

statements contained therein not misleading.  These Defendants did not make a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects.  Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.  In alleging the foregoing, Plaintiff specifically disclaims any allegation of fraud.

172.    Plaintiff acquired the Company's ordinary shares pursuant to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein.  Plaintiff sustained damages, and the price of the Company's ordinary shares declined substantially due to material misstatements and omissions in the Offering Documents

173.    This Count is brought within one year after discovery of the untrue statements and omissions in the Prospectus and within three years after the Company's common shares were sold to the Class in connection with the February 2019 Offering.

174.    By reason of the conduct alleged herein, the Defendants named in this Count violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violation, Plaintiff and the other members of the Class, who purchased MacroGenics shares pursuant to the Prospectus, sustained substantial damages in connection with their share purchases.  Accordingly, Plaintiff and the other members of the Class, who hold the ordinary shares issued pursuant to the Prospectus, have the right to rescind and recover the consideration paid for their ordinary shares with interest thereon or damages as allowed by law or in equity.  Class members who have sold their MacroGenics shares seek damages to the extent permitted by law.

**COUNT III**
**For Violation of §15 of the Securities Act**
**Against the Officer Defendants**

175.    Plaintiff incorporates ¶¶1-174 by reference.

176.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Officer Defendants.

177.    The Officer Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, had the power to influence, and exercised same over the Company to cause it to engage in the conduct complained of herein.  Moreover, the Company controlled the Officer Defendants and all of MacroGenics' employees.

178.    Similarly, each of the Officer Defendants controlled the Company, which is subject to liability as a primary violator of §§11 and 12(a)(2) of the Securities Act, as alleged in Counts III and IV above, and they directly participated in controlling MacroGenics by having signed or authorized the signing of the Offering Documents and authorizing the issuance of the MacroGenics common shares that were sold to Plaintiff and the members of the Class.

179.    As control persons of MacroGenics, each of the Officer Defendants are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as MacroGenics for its violations of §11 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as Class Representative under Fed. R. Civ. P. 23 and plaintiff's counsel as Lead Counsel;

B.    Awarding Plaintiff and the members of the Class damages and interest;

C.    Awarding Plaintiff reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  October 16, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

_/s/ William C. Fredericks_

William C. Fredericks (*pro hac vice*)
Donald A. Broggi (*pro hac vice* forthcoming)
Rhiana L. Swartz (*pro hac vice* forthcoming)
Jonathan M. Zimmerman (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
dbroggi@scott-scott.com
rswartz@scott-scott.com
jzimmerman@scott-scott.com

*Attorneys for Lead Plaintiff Employees'*
*Retirement System of the City of Baton*
*Rouge and Parish of East Baton Rouge*

Steven J. Toll (MD 15824)
Jan E. Messerschmidt (*pro hac vice*)
**COHEN MILSTEIN SELLERS**
**& TOLL PLLC**
1100 New York Avenue, NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

*Local Counsel for Lead Plaintiff Employees'*
*Retirement System of the City of Baton*
*Rouge and Parish of East Baton Rouge*